Anabelle DARBY, Next Friend of Craig Darby, Minor, and Ann C. Falkenstern, Next Friend of Peter Charles Falkenstern, Minor, Plaintiffs,

v.

Philip H. SCHOO and John Fitzpatrick, Defendants.

No. G 81–45.

United States District Court, W. D. Michigan, S. D.

July 7, 1982.

James M. Catchick, Grand Rapids, Mich., for plaintiffs.

Jon G. March, Grand Rapids, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

On February 2, 1981, a First Amended Complaint, verified by the Plaintiffs, was filed with this Court seeking injunctive relief and damages as a result of the alleged suspension/expulsion of the minor Plaintiffs, Craig Darby and Peter Charles Falkenstern (hereinafter Darby and Falkenstern). The cause was brought under 42 U.S.C. § 1983 and the due process clause of the Fourteenth Amendment. On the same date as the filing of the Amended Complaint, this Court granted a Motion for a Temporary Restraining Order[1] restraining the Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from continuing to exclude the children of the Plaintiffs from attendance at Forest Hills Public Schools in Kent County, Michigan. The Court further ordered that Darby and Falkenstern be reinstated in the Forest Hills Public School system. Six days later, the Court extended the Temporary Restraining Order until February 17, 1981, and ordered that the Defendants commence a meeting of the Board of Education on February 11, 1981, for the purpose of conducting a hearing as required by section 2(c) of the School Board Student Suspension/Expulsion policy. The Court directed that the Board of Education meet "until the matter has been completely heard", and report its findings forthwith. During this time, the minor children Darby and Falkenstern were to remain in school with the same rights and privileges afforded to every other student until the issue of due process was resolved and the report rendered. On February 17, 1981, the parties appeared before this Court for a hearing on Plaintiffs' Motion for a Preliminary Injunction. At that time, Plaintiffs' counsel informed the Court that the provisions of the February 8 Order had been complied with and that, consequently, Plaintiffs were no longer seeking injunctive relief. Accordingly, the Court dissolved the Temporary Restraining Order and set this matter over for trial on Plaintiffs' claim for damages.

This case was tried before the Court, sitting without a jury, on April 2–6, 1982, and having considered the pleadings, testimony of the witnesses, and documents offered into evidence; the Court makes the following findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure:

As emphasized by Defendants' counsel at the trial of this case, the chronology of events in this matter is not only crucial,·but dispositive of the issues raised herein. Further, in order to properly understand the factual context of this case it is necessary to identify the actors and the events in question. Craig Darby and Peter Falkenstern were students enrolled in Forest Hills Central High School during the first few weeks of January, 1981. Additionally, Defendant John Fitzpatrick was, at all times relevant to this action, principal of that high school; and Defendant Philip H. Schoo was, during this time, superintendent of the Forest Hills Public Schools. After the weekend of January 10 and 11, 1981, the lives of these individuals became progressively and inexorably intertwined.

1. In reaching its decision to grant a Temporary Restraining Order, this Court found, pursuant to Rule 65 of the Federal Rules of Civil Procedure, that:

    1. The children of the Plaintiffs have been denied further educational opportunities at the Forest Hills Public Schools pursuant to, among other things, letters to the parents from the Defendants.

    2. The children of the Plaintiffs have been 'excluded' from the Forest Hills Public Schools for the balance of the school year (1980–1981).

    3. Said exclusion amounts to an 'expulsion' as set forth in the Forest Hills Public Schools 'Student Suspension/Expulsion' policy.

    4. Prior to any expulsion certain due process rights are afforded the parents and/or the students based upon Student Suspension/Expulsion policy of the Forest Hills Public Schools.

    5. Defendants have not complied with the Forest Hills Public Schools due process policy.

Without belaboring the individual deeds committed, it is sufficient to note that certain acts of vandalism, unlawful entry, theft and destruction of public property occurred over this weekend which, unquestionably, were committed by, *inter alia*, Darby and Falkenstern. This felonious behavior was continued on the afternoon of Monday, January 12, 1981, when Falkenstern destroyed and burned stolen school attendance records. It was while Falkenstern was carrying the smoldering school attendance records that he was arrested by Sheriff's detectives at his home on January 12. That evening, Falkenstern remained in jail, being subsequently released on January 13, whereupon he returned to his home, thereby missing school for that day. Darby, on the other hand, spent January 12 attending Forest Hills Central, and was not apprehended until January 13. He was released from custody that afternoon.

On the afternoon of Wednesday, January 14, Darby, Falkenstern and one of the other students involved in the weekend antics met with Defendant Fitzpatrick and Assistant Principal Ed Griffen (another Assistant Principal, Martin Keller, was periodically in and out of this meeting). This meeting was initiated by the students who wished to admit their culpability, apologize and offer to make restitution. The meeting lasted for approximately two hours during which time Darby and Falkenstern admitted their involvement in the weekend incident and prepared written statements detailing their acts. Both boys were given ample opportunity to explain their actions and to offer any mitigating or extenuating circumstances. The appropriate discipline was then discussed whereupon Darby and Falkenstern both penned what they felt their punishment should be.

In conjunction with this aspect of the meeting, a matter of concern to school officials was also discussed; to wit, how Darby and Falkenstern came to be in possession of a school pass key. This key was utilized to gain entry into the school over the weekend and was copied by Falkenstern on Monday prior to his arrest, purportedly so that he might offer school pass keys for sale. Because it was so unusual to have a student possess such a key, the school administrators were interested in determining whether this key had been used to effect earlier thefts of school property. During this time Darby became "agitated", as Falkenstern, in concert with another student, began "pressuring" him "to come clean." The school administrators similarly urged Darby to explain how the pass key came into the hands of the students; Darby indicating, to the disbelief of the principal that he simply found the key in a door approximately a year prior to this incident. Eventually Darby left this meeting, explaining that he felt Fitzpatrick was "acting crazy", so much so that he believed Fitzpatrick was going to hit him, and that prudence dictated Darby's departure.

Indeed, both Darby and Falkenstern characterized Fitzpatrick as angry, yelling, cursing and out of control. They alleged that, because of this demeanor, the statements written pertaining to the type and form of discipline the boys should receive, prepared as already noted by both Darby and Falkenstern, were coerced. Fitzpatrick denied these allegations, as did Griffen. Fitzpatrick agreed that his voice was raised, but only, he says, to stress the seriousness of the situation and his disappointment with the young men. Griffen concurred with this assessment of Fitzpatrick's demeanor and testified that the statements (concerning what punishment the boys felt was proper) were not coerced; that each boy was told to write what he thought ought to happen, not what he thought the school officials wanted to hear. Having had the benefit of hearing all the testimony, the Court has determined that the perceptions of Darby and Falkenstern were, in all likelihood, colored by the individual trauma each boy was experiencing at the moment. The testimony of Fitzpatrick and Griffen, with respect to the tenor of this meeting, is, in this Court's estimation, a more credible and accurate description of the discussions. The Court has, therefore, determined that Exhibits B through E were freely and voluntarily proffered. At the

conclusion of this meeting Fitzpatrick suspended the students from Forest Hills Central High School. This action was confirmed by Fitzpatrick in a letter addressed to the parents of Darby and Falkenstern, dated January 15, 1981 (Exhibits F and G), in which Fitzpatrick informed the parents that, as a result of the students' involvement in the felonious acts which occurred over the weekend of January 10 and 11, they were "being placed on indefinite suspension pending completion of an investigation of this matter". Fitzpatrick continued:

> I will be prepared on Monday, January 19, to discuss the disciplinary action which I will be recommending to the superintendent of schools.
>
> You are welcome to meet with me on Monday to discuss my recommendation if you are so inclined.

On January 15, in addition to authoring this letter, Fitzpatrick met with Darby, who returned to school to apologize for leaving the previous day's meeting, and to discuss disciplinary alternatives. At the conclusion of this meeting Darby was also informed that he was suspended from Forest Hills Central High School.

The parents of the boys did meet, separately, with Fitzpatrick on Monday, January 19. Prior to these meetings, Fitzpatrick reviewed, with the students' teachers and counselors, the status of the students at the school and available alternate educational options. Indeed, the teachers were asked to consider the individual progress of the students and to make a report to the counseling department.

At the two meetings, the parents admitted their sons' involvement and were given a full and ample opportunity to offer any extenuating or mitigating circumstances. Fitzpatrick related that he felt this was a serious matter and that it was difficult to discern why such an incident involving these boys had occurred. He then set forth the status of the situation as he perceived it and his desire to work something out for the benefit of all concerned. Falkenstern's father, in response, indicated no desire to return his son to Forest Hills Central, but rather a preference for having Falkenstern retained in a day school setting, volunteering the possibility of Forest Hills Northern High School as an option. Fitzpatrick acknowledged this alternative, but related that he was not authorized to act upon such a transfer. He did, however, promise to bring the matter to the attention of the school superintendent. The older Falkenstern then posited the possibility of some form of community service and restitution, to which Fitzpatrick indicated that his views were not yet final, and that the parents should contact him to work out the ultimate punishment. Fitzpatrick informed the Falkensterns what tentative discipline he believed would be appropriate, and, in the process, discussed alternatives (other than day school, by identifying other educational options available). These included a day alternative with a consortium the school maintained with the North Kent Skills Center, and a potential transfer within the school district. Indeed, by this time, Darby's mother, who appeared distraught at her meeting with Fitzpatrick, and who indicated a certain disappointment in her son, reported that Darby had already enrolled in night school. She did not indicate any dissatisfaction with this alternative (or a desire to return Darby to Forest Hills Central), and Fitzpatrick felt that it would be a good choice for the boy.

Fitzpatrick concluded each meeting by cautioning that his views were not the final word on this unhealthy situation, but that he was only empowered to make recommendations. The parents, he stated, had a right to appeal whatever recommendation he made to Defendant Schoo, although he fully expected Schoo to concur in, and implement the recommendations he would make.

Following this meeting, Fitzpatrick met with the guidance department at the school and, in addition, followed up the initial teachers meeting with another teacher conference. This action was taken so that Fitzpatrick: (1) could consider the situation once again; (2) discover as much information as possible concerning Darby and Falkenstern's academic standing, and; (3) insure

that alternative forms of education were available. It is noted that during the week of January 19, the faculty of Forest Hills Central was busy administering first semester final exams.

On Thursday, January 22, Fitzpatrick forwarded to the parents of the boys a letter setting forth his recommendations (Exhibits H and I). Those recommendations included:

1. Exclusion from Forest Hills Central for the balance of the school year (June 12, 1981) and loss of all privileges as excepted below.

2. Termination of current course work as of January 9, on a "credit-no credit" basis as awarded by the students' teachers.

3. Payment of restitution.

4. Performance of community service and/or volunteer work.

5. Forest Hills Central Counseling Department Services be available to the students for arrangement of alternative educational placement, adult education, college counseling, transfer to another institution, employment or other appropriate placement.

6. Return to Forest Hills Central, if so requested, only after the completion of the restitution arrangements as listed above, and in no case before September, 1981.

7. Official graduation in no case before the regular ceremony in June, 1982, if so requested.

The principal closed by stressing that "it is our intent to fix a fair punishment for the students and assist them to become a success in spite of this mistake. I am willing to offer personal assistance to (them) in furthering (their) education". This letter was hand carried to Schoo, who did not participate in the formulation of the above recommendations.

On January 23, Schoo sent the students' parents a letter concurring in Fitzpatrick's recommendations and informing the parents of their right to be heard by the Board of Education. (Exhibits J and K). Both letters are phrased identically with the exception of the reference to the individual student:

I have reviewed the factors involving your son (Peter's) expulsion from Forest Hills Central High School and have received a copy of Mr. Fitzpatrick's letter to you outlining his recommendations following (Peter's) admission of breaking and entering at Central High School. I support Mr. Fitzpatrick's recommendations and encourage you to work with him.

Please be assured it is our intention as school officials to help your son overcome this unfortunate incident. If you have any questions or concerns regarding this matter, please contact me.

You have the right to request a hearing before the Board of Education *to appeal the action taken by the administration. If you wish* to have a hearing scheduled, please let me know in writing no later than Friday, January 30. (Emphasis supplied).

This letter, as well as Fitzpatrick's, were received by the parents of both students on January 24. As a result of these letters, the parents independently phoned Schoo to set up separate appointments, and on January 27, Falkenstern's father did, in fact, meet with Schoo. During this meeting the elder Falkenstern outlined his concern regarding his son's behavior and discussed the need to have Peter perform some type of community service. He also expressed concern over the recommendations set forth by Fitzpatrick, and asked that his son be transferred to Forest Hills Northern High School as an alternative educational option. Schoo responded by telling Mr. Falkenstern that that matter would have to be reviewed with Fitzpatrick and with the Northern High School principal, Mr. Lane. The meeting concluded with no disposition and so Falkenstern handed Schoo a letter requesting an appeal of his and Fitzpatrick's recommendations to the School Board. (Exhibit L). Contrary to the testimony of Mr. Falkenstern, this Court does not believe that Schoo stated, when handed this notice, that such an appeal would be a "waste of time".

In contrast to the meeting of Mr. Falkenstern with Schoo, the meeting scheduled for the 24th, which Mrs. Darby requested, was cancelled by her because she did not wish to put herself through "turmoil" which she believed would result if the meeting were conducted. Thus Schoo, on the afternoon of the 27th, instead, met with Lane and Fitzpatrick at which time it was determined that placement at Forest Hills Northern High School was not advisable. This decision was subsequently conveyed later that evening to Mr. Falkenstern. Thereafter, Schoo acted quickly to set up a hearing before the Board of Education as his *de bene esse* deposition reveals:

Q. Did you then proceed to attempt to arrange a hearing with the Board of Education?

A. Yes, I did.

Q. Tell us about that effort.

A. Well, we attempted to set it up for as quickly as we could. At first we tried to schedule it for Wednesday or Thursday of that week. It turned out that during those two days, we didn't have a quorum. We did have a quorum by Friday.

Q. A quorum of the Board of Education?

A. Yes. We did by Friday, but at that point, a couple of the people were still out of town, so we ultimately agreed to set it up for Monday, which had to be February 2.

Q. The Wednesday and Thursday that you're talking about are the Wednesday and Thursday preceding February 2?

A. Yes, and following the receipt of that letter.

Q. All right.

A. And I kept in contact with Mr. Falkenstern during this period, trying to keep him informed of the efforts to schedule it.

Q. You say there was a quorum present on Friday of the Board?

A. I believe there was.

Q. Why then was the meeting not scheduled for that Friday preceding February 2?

A. Well, given the seriousness of the offense, we wanted everyone there and at that point, there was very little difference between Friday or Monday.

Q. You say that you ultimately did notify Mr. Falkenstern of the time and place of the meeting.

A. Yes, I did.

Q. How was that done?

A. If I recall, it was done by phone.

Q. All right.

A. The meeting was posted, Jon.

Q. I'll show you what we've marked as Exhibit E to the deposition. Is that a copy of the public notice of the meeting?

A. Yes, it is.

Q. And that was posted at the normal places at which you post notices of the meetings for the Forest Hills Board of Education?

A. Right.

Q. Now, the hearing that you scheduled for February 2, was it your intent to conduct that in accordance with the regulation?

A. Yes, it was.

        *    *    *    *    *    *

Q. You ultimately were served a copy of a Temporary Restraining Order in this lawsuit, is that correct?

A. Yes, I was.

Q. When was that, do you recall?

A. Monday afternoon. It was 1:30 or 2:00 o'clock, something like that.

Q. That's February 2?

A. Yes.

Q. The hearing was scheduled to begin later that afternoon, is that correct?

A. Five-thirty that afternoon.

Q. What did you decide to do with that hearing?

A. At that point, the hearing was cancelled pending our meeting with the Judge in Kalamazoo or with the court.

Q. Was the hearing ultimately held?

A. Yes, it was. (Schoo Deposition of June 25, 1981, pp. 17–20).

Following the issuance of the Temporary Restraining Order, a hearing was conducted

on the nights of February 11 and 12, before the Forest Hills Board of Education. The Board decision, dated February 16, 1981, substantially affirmed the proposed punishment recommended by Fitzpatrick and concurred in by Schoo. This decision resulted in the expulsion of the students from Forest Hills Central.

The School Code of 1976 was enacted to *inter alia*, revise, consolidate, and classify the laws relating to elementary and secondary education in the State of Michigan. Part 16 of the Code outlines the general powers and duties of school boards and provides in pertinent part at M.C.L.A. § 380.-1311; M.S.A. § 15.41311:

The board may authorize or order the suspension or expulsion from school of a pupil guilty of gross misdemeanor or persistent disobedience when in the board's judgment the interests of the school may demand the authorization or order.

Pursuant to this grant of statutory authority, the Forest Hills Board of Education expressed its judgment as to when, following proof of guilt of a "gross misdemeanor or persistent disobedience", suspension or expulsion is in the interests of the school. That expression is set forth in Exhibit N [2],

2. The Forest Hills Suspension/Expulsion policy provides in pertinent part:

Violations of this policy may result in disciplinary action, temporary separation (suspension), or expulsion from the Forest Hills Public Schools.

1. This policy shall apply to the following categories of misconduct. These categories are general in nature and the examples given are not to be considered all inclusive.

a. Matters relating to public and private property such as:

(1) theft

\* \* \* \* \* \*

(3) defacing property

(4) trespassing (unauthorized presence on school property)

b. Matters pertaining to citizenship such as:

(1) violation of state laws, local ordinances, approved safety and fire codes, laws pertaining to civil disobedience

\* \* \* \* \* \*

2. In any matters involving disciplinary actions based upon an alleged violation of this policy, the procedures below will be followed:

a. Whenever it is alleged that a student has violated a provision of this policy, the student shall be informed by the appropriate administrative personnel of such alleged violation and of the discipline to be imposed. In each such case the student and his parent or guardian shall be offered an opportunity to meet with the administrator involved, for purposes of:

(1) contesting the facts of the alleged violation, and

(2) contesting the appropriateness of the discipline to be imposed.

b. Administrative personnel shall have authority to suspend a student temporarily for persistent disobedience of school rules or for a malicious or willful violation of this policy involving gross misbehavior. In any such event, the procedures set forth in paragraph a. above shall apply together with the following additional procedures:

(1) The administrator shall arrange for an alternative educational process for any period of suspension in excess of five school days.

(2) The administrator shall offer to meet with the parents or guardian of the student in order to review steps necessary for a satisfactory return to the regular classroom schedule.

(3) The parents or guardian of the student shall have the right to appeal the administrator's action to the superintendent or his designee.

c. The Board shall have authority to expel a student for persistent disobedience of school rules or for a malicious or willful violation of this policy whenever the Board determines such action to be necessary. In any such instance, the following procedures shall be followed prior to effective date of such expulsion:

(1) The student and his parents or guardian shall be informed in writing of the alleged violation of this policy and of the fact that expulsion of the student is the discipline to be imposed.

(2) The Board shall establish a reasonable time and place for a hearing on the matter, and shall so notify the student and his parent or guardian.

(3) The hearing shall be held by one or more impartial persons designated by the Board for this purpose, provided that none of such persons shall be involved in the making of the charge or prosecution of the alleged violation.

(4) Hearsay and other untrustworthy evidence shall not be the basis for a decision.

(5) An adequate record or summary of the hearing shall be maintained.

(6) A written decision shall be made by the Board within 30 days of such hearing.

(7) A student and his parents or guardian may waive the right to such hearing at any time.

and the actions of Defendants must, in part, be examined in view of this policy. Before turning to that discussion, the foregoing statute must be examined.

■ I am convinced, after a thoughtful analysis, that M.C.L.A. § 380.1311 is susceptible to two different interpretations, depending upon how the reader construes the language employed by the legislature; i.e. whether the statute is read narrowly or broadly. A narrow interpretation presupposes that a board of education may empower ("authorize") school administrators to suspend or expel only after the board has made a decision ("when in the board's judgment") in an individual case ("a pupil"), that suspension or expulsion is demanded by the interest of the school. So read, this construction of the term "authorize" merely allows school administrators to implement "the dirty work" of a timid school board. Likewise, the statute construed in this manner, forces an individualized determination by a board in each and every case of suspension or expulsion. Such a construction would hamper the ability of school officials to react appropriately to immediate concerns during the course of a school day. Finally, the statute posits a time element by the use of the word "when". In reading the statute in this manner no board policy could ever be developed which would allow school administrators to suspend or expel a student, as that decision would rest solely with the school board. This construction cannot be what was intended when this legislation was drafted and, therefore, I am persuaded that a more reasonable construction for this inartfully drafted statute is necessitated.

Such a construction permits a school board to exercise its judgment, in the absence of a particular case, i.e. a school board may create a policy, delineating what conduct it believes merits disciplinary measures such as suspension or expulsion. In reading the statute in this fashion, the term "authorize" takes on a much more expansive meaning. As the legislature envisioned, school board meetings cannot be called to meet each and every crisis that arises during the course of a school day. Rather, school boards oversee the operation of schools and entrust the administration of these schools to qualified personnel, who are in a position to deal with crisis situations. It is unfathomable that a school board meeting would have to be held before any suspension could be imposed, and assuredly the legislature did not intend such a result. Accordingly, the term "authorize" must be read so that administrators may be allowed to impose the sanction of suspension; and in the appropriate instance of delegation, expulsion, after a careful observation of school board guidelines (in contrast to a construction that results in administrators being merely the rubber stamps of faceless school boards). Similarly, the phrase "a pupil" must be construed to mean any pupil and not just "the" pupil.

Also the time element in the statute cannot be so limited as to dictate that suspension or expulsion can only be effected *after* an individual case is considered. Rather, this time element can be exercised at any time, so long as the school board sets forth what interests, to the school, require that suspension or expulsion be imposed; and what procedures school administrators must follow before these potentially invidious sanctions are imposed. This form of delegation is precisely what the Forest Hills School Board did, in this instance, and the Plaintiffs' argument that only the school board may suspend these students lacks merit. A specific expression of this school board's will is found in Exhibit N. There, it can be seen, the school board has reserved the power of expulsion for itself, but has

3. A student charged with a violation of this policy shall have the following rights in any disciplinary proceeding described above:

a. To be accompanied and represented by his parents or guardian and an advisor or counsel of his choosing;

b. To remain silent without prejudice;

c. To refrain from testifying against himself; and

d. In any hearing, to have the right to testify, to present evidence and witnesses in his own behalf, and to hear and question adverse witnesses or evidence.

authorized school administrators to suspend students.

■ Undeniably, the conduct of these pupils constituted a malicious and willful violation of this school board policy involving gross behavior, thereby authorizing the administrative personnel of Forest Hills Central High School to temporarily suspend the students. The policy/regulation speaks of a temporary suspension, but does not define "temporary". Paragraph 2(b)(1) of the regulation implies, however, that a temporary suspension may last longer than five school days, because it requires school administrators to arrange alternative educational processes for a suspension in excess of this period. Questions persist: how long may these school administrators suspend these students or how long may a suspension last in excess of the five day period? To find the answer, the Court must look to relevant case law.

At first blush, this school board policy, is in accord with *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) wherein an Ohio statute permitting an administrator to suspend students from school for up to ten days, without a hearing, was challenged as being unconstitutional. The Supreme Court in holding that due process applies to such disciplinary action, opined:

We do not believe that school authorities must be totally free from notice and hearing requirements if their schools are to operate with acceptable efficiency. Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school.

There need be no delay between the time 'notice' is given and the time of the hearing. In the general majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is. *Id.* at 581–582, 95 S.Ct. at 739–40.

Here, Darby and Falkenstern were afforded a *Goss* type hearing, as outlined above, on January 14 when they met with Fitzpatrick. That meeting, as already mentioned, was initiated by the students who fully and freely admitted their involvement in the weekend's felonious acts. The requirement of *Goss* that the students be informed of the accusations and the basis underscoring those accusations at issue is, therefore, inapplicable to the factual context of the instant case. The remaining element of *Goss* pertains to providing students with an opportunity to present their side of the story. After considering the testimony of all of the witnesses, I am persuaded that the students had a full opportunity to explain the acts in which they admittedly were involved. They also had an opportunity to discuss what an appropriate discipline might be; and I find the testimony to the effect that this opportunity was seriously curtailed by explicit or implicit coercion is unsubstantiated, and lacking in credibility. Hence, the pupils herein were *suspended*, following a hearing, which fully comported with the due process requirement of *Goss.* This analysis, however, is not dispositive, inasmuch as the subsequent actions of the Defendants are critical to a final determination.

Counsel for the Plaintiffs urges that Fitzpatrick and later Schoo, did not suspend the students at all, but rather expelled them. In support of this theory, Plaintiffs point to Fitzpatrick's letters of January 15 addressed to Plaintiffs' parents where he writes that the pupils are being placed on an *indefinite* suspension pending completion of an investigation.

The use of the word *indefinite*, is, in and of itself, not conclusive of the issue since it is clear that the suspension would last only until the investigation the school officials were conducting was completed. Moreover, the time for the completion of this investigation is clearly intimated by Fitzpatrick in the letter when he informs the parents that he will be prepared to discuss with them, on January 19, the appropriate punishment he will be recommending to the superintendent. This statement presupposes that the investigation will be completed by that time, whereupon it will be determined whether to continue the boys' suspension, or to take the appropriate steps to expel them from school. At this point in time, a crucial distinction was manifested in the way the students were disciplined.

On January 19, Fitzpatrick determined that: "(t)he four students will be terminated as students at Forest Hills Central High School as of January 9, 1981". (Exhibit T). This declaration is found in a memorandum, authored by Fitzpatrick, which summarized a meeting with the pupils' teachers on January 16, 1981. During the trial, Fitzpatrick testified that this quoted language only referred to his recommendation to deny academic credit for the pupils' first semester work. This explanation, however, in this Court's opinion, is not credible since it is clear that on January 19, Fitzpatrick intended that Darby and Falkenstern not return to Forest Hills Central High School for the balance of the school year. Does this mean, though, that Fitzpatrick, by virtue of this declaration, expelled the students from school? As counsel for the Defendants ably

argues, in answer to this rhetorical query, Fitzpatrick merely *recommended* that the students not return to Central High School.

This semantic distinction pales upon analysis. Quite frankly, Fitzpatrick, and later Schoo, were required to follow and guided by section 2(b) of the School Board Suspension/Expulsion policy (Exhibit N). That section contemplates that a student suspended will eventually be returned to his or her regular classroom schedule. Defendants' exclusionary recommendation did not envision such an occurrence until, at the very earliest, the beginning of the next school year, thereby indicating that the "suspension" which was previously imposed was to last for an entire semester and the following summer. Why then did the Defendants adhere so closely to section 2(b) when they never intended to undertake a review to discern when the students could return to their regular classroom schedules? The answer to the foregoing, the Court believes, directs a potentially invidious result. It is obvious that the Defendants attempted to further the educational interests of the students by seeking alternative processes; the result of which would be the removal of the students from Forest Hills Central High School. However, as a consequence of the open-ended nature of the suspension imposed, the parents of the students, when faced with this tentative option of an alternative education or the continuance of said "suspension", were, in this Court's view, impermissibly·encouraged to acquiesce in this removal or "self-imposed expulsion".[3]

---

**3.** As noted in the findings of fact outlined earlier in this Opinion, Mrs. Darby had already enrolled her son in night school by the time of this metamorphis. The reason for this enrollment is twofold; panic and worry over the possibility of Darby dropping out and a lack of knowledge of other alternative sources of education. Indeed, Mrs. Darby specifically enrolled her son in night school so that he could receive some alternative education as contemplated by section 2(b) of the School Board Suspension/Expulsion policy. She testified that she felt this was the only available program which her son *could* attend, pending a school board hearing, and that she was going

to pull Darby out of this program as soon as the suspension was terminated. Even though Mrs. Darby did not request a school board hearing and her actions in dealing with the Defendants' recommendations indicate a form of acquiescence, these factors do not relieve the Defendants from any potential liability to Darby since: (1) Mrs. Darby was only following the provisions of section 2(b) of the Suspension/Expulsion policy, which contemplates that a suspension will not be indefinite, and; (2) Mrs. Darby should not have had to request a hearing at all. Rather, the Defendants should have scheduled a hearing pursuant to section 2(c) of said policy on their own initiative. It

Thus, while the Defendants were seeking to continue the students educational opportunities, they were also achieving, by virtue of the omission of an end date for the students' suspension, a desired result; i.e., the removal of the students from Central High School. This objective, in the Court's opinion, was not contemplated by section 2(b) of the School Board policy or by *Goss.* Indeed, the temporary suspension imposed on January 15 became an indefinite suspension, in the literal sense, and was, thereafter, without question an expulsion; a disciplinary measure reserved, under the Suspension/Expulsion policy, solely to the Forest Hills School Board. The fact that Fitzpatrick and Schoo only recommended termination as students at Central High School is not conclusive, as their actions belie the terminology employed. As soon as it was concluded that Darby and Falkenstern would not return to Central High, Defendants should have either: (1) put a cap on the period of suspension and taken steps to request a board hearing at the end of this period to determine whether the students should be expelled, and/or; (2) end the suspension and request such a hearing forthwith. Neither action was undertaken by the Defendants in the case at bar.

As already noted, the initial meeting of January 15 comported with the fundamental due process requirements for a short term suspension under *Goss.* When this suspension changed its character to that of an expulsion, *Goss* and the school board policy in Exhibit N were violated. The court in *Goss* explicitly announced:

We should also make it clear that we have addressed ourselves solely to the short suspension, not exceeding 10 days.

*Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures.* Nor do we put aside the possibility that in unusual situations, although involving only a short suspension, something more than the rudimentary procedures will be required. *Id.* at 584, 95 S.Ct. at 741. (Emphasis supplied).

The Forest Hills School Board, in view of *Goss,* has promulgated more formalized hearing requirements for expulsions than for temporary suspensions. (See footnote 2). Among the requirements enumerated are: (1) a student and his parents must be informed in writing of the alleged violation of the Suspension/Expulsion policy and of the fact that expulsion is the discipline to be imposed, and; (2) a hearing must be scheduled at a reasonable time and place. Neither of these mandatory steps were implemented in the instant case. No written notice was provided, and the hearing that was eventually scheduled was occasioned, not by the school administrators, but by the parents of Falkenstern, who wished to have the recommendations of Fitzpatrick and Schoo reviewed. Moreover, this hearing, scheduled for February 2, 1981, would not necessarily be of the same nature as if it had been duly scheduled under section 2(c) of the School Board policy since the scope of the February 2 hearing would be restricted to a *review* of the Defendants' recommendations in contrast to a more expansive hearing envisioned by the school board under this section. Accordingly, the Court is constrained to conclude that the pupils' due process rights were violated by the Defendants.[4]

appears that Mrs. Darby was awaiting the time when the Defendants would inform her that her son's suspension was over so that Darby could leave night school and return to Forest Hills Central. This never happened as the suspension of Darby soon became an expulsion when the Defendants deviated from the provisions of section 2(b). Darby should not, therefore, be punished by restricting this cause, for taking action under this suspension policy. She merely relieved the Defendants of their responsibility under section 2(b)(1) of that policy.

4. The Court pauses to reflect on the words of Justice Powell, dissenting in *Goss*:

The State's generalized interest in maintaining an orderly school system is not incompatible with the individual interest of the student. Education in any meaningful sense includes the inculcation of an understanding in each pupil of the necessity of rules and obedience thereto. This understanding is no less important than learning to read and write. One who does not comprehend the meaning and necessity of discipline is handicapped not merely in his education but throughout his

■ The Defendants, however, as school officials enjoy a qualified good faith immunity from compensatory damages. This good faith immunity was established by the Supreme Court in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) where the individual liability of school administrators and school board members was at issue. The *Wood* court explained the need for such immunity as follows:

Liability for damages for every action which is found subsequently to have been violative of a student's constitutional rights and to have caused compensable injury would unfairly impose upon the school decisionmaker the burden of mistakes made in good faith in the course of exercising his discretion within the scope of his official duties. School board members, among other duties, must judge whether there have been violations of school regulations and if so, the appropriate sanctions for the violations. Denying any measure of immunity in these circumstances 'would contribute not to principled and fearless decision-making but to intimidation.' *Pierson v. Ray, supra,* [386 U.S. 547] at 554, [87 S.Ct. 1213 at 1218] 18 L.Ed.2d 288. The imposition of monetary costs for mistakes which were not unreasonable in the light of all the circumstances would undoubtedly deter even the most conscientious school decisionmaker

from exercising his judgment independently, forcefully, and in a manner best serving the long-term interest of the school and the students.

\*  \*  \*  \*  \*  \*

We think there must be a degree of immunity if the work of the schools is to go forward; and, however worded, the immunity must be such that public school officials understand that action taken in the good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity. 420 U.S. at 319–321, 95 S.Ct. at 999–1000.

The *Wood* court thereupon set forth the appropriate standard by which the actions of school officials could be judged:

The official himself must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice.

To be entitled to a special exemption from the categorical remedial language of § 1983 in a case in which his action violated a student's constitutional rights,

---

subsequent life. In an age when the home and church play a diminishing role in shaping the character and value judgments of the young, a heavier responsibility falls upon the schools. When an immature student merits censure for his conduct, he is rendered a disservice if appropriate sanctions are not applied or if procedures for their application are so formalized as to invite a challenge to the teacher's authority—an invitation which rebellious or even merely spirited teenagers are likely to accept.

The lesson of discipline is not merely a matter of the student's self-interest in the shaping of his own character and personality; *it provides an early understanding of the relevance to the social compact of respect for the rights of others.* The classroom is the laboratory in which this lesson of life is best learned. Mr. Justice Black summed it up: 'School discipline, like parental discipline, is an integral and important part of training our children to be good citizens—to be better

citizens.' *Tinker [v. Des Moines School Dist.],* 393 U.S., [503] at 524, [89 S.Ct. 733 at 746, 21 L.Ed.2d 731] 21 L.Ed.2d 731 (dissenting opinion). 419 U.S. at 592–593, 95 S.Ct. at 745. (Emphasis supplied; footnote omitted).

Darby and Falkenstern have aged one year since this incident marked their lives. It is to be hoped that both young men will view this experience as a point of demarcation; an opportunity to mature and realize responsibility— to understand education for what it really is; not merely a right, but a privilege. The privilege to develop a mind and body so as to be free. The waste of a human mind is a terrible tragedy. Unfortunately, young adolescent minds, being educated, do not have the luxury of the wisdom of the ages to impart to them what an important facet of their development and subsequent life the educational process commands. Maybe not now, maybe not ten years from now, but someday Darby and Falkenstern will comprehend the real loss they suffered by their contemptuous behavior.

a school board member, who has voluntarily undertaken the task of supervising the operation of the school and the activities of the students, must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of his charges. Such a standard neither imposes an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system. Any lesser standard would deny much of the promise of § 1983. Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 *if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected*, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student.

\* \* \* \* \* \*

A compensatory award will be appropriate *only if the school board member has acted* with such an impermissible motivation or *with such disregard of the student's clearly established constitutional rights that has action cannot reasonably be characterized as being in good faith.* 420 U.S. at 321–322, 95 S.Ct. at 1000–01. (Emphasis supplied).

In the immediate case Defendants Fitzpatrick and Schoo, in dealing with Falkenstern and Darby, at all times acted within their official capacities as principal and superintendent. These Defendants were faced with extremely serious violations of, not only school policy but, also, the Michigan criminal code. The response of the Defendants, to their credit, was touched with concern and professionalism. Indeed, it cannot be said that their decision to discipline Darby and Falkenstern was misplaced or easy. The Defendants had to consider many competing interests in formulating the proper disciplinary measure. These interests included the wider interests of the entire school district; Forest Hills Central High School; the morale of both the student population and faculty; and, especially, the impact of the disciplinary decision on Darby and Falkenstern. As expressed by Defendants' counsel, Fitzpatrick and Schoo:

> ... honestly believed that to allow students who had just *admitted* vandalizing the school, stealing school property, and burning records to immediately return to the classroom would create an image or impression on other students that such conduct was acceptable. (Post trial brief, p 16). (Emphasis in original).

■ I am in complete accord with this concern, and believe that the behavior exhibited by these Plaintiffs was inexcusable and a breach of the educational privilege. It is only to be hoped that these, now, young men have matured and been deterred from further felonious behavior by this sorry incident. Unfortunately, the Defendants reacted inappropriately by exercising a disciplinary prerogative expressly reserved to the Forest Hills School Board. In doing so they knew or should have known that the action they were taking was outside their sphere of official responsibility. They must be charged with a more than adequate knowledge of the School Board regulations involved and, therefore, it must be presumed that they knew that expulsion could only be effected after a school board hearing, and that an "indefinite suspension" was not provided for under this policy. In light of the foregoing, it must be concluded that the Defendants knew or should have known that their actions in so suspending Darby and Falkenstern would violate the students' constitutional due process rights. This is not to say that personal malice or vindictiveness was involved in the disciplinary process; rather it appears that the Defendants acted with complete disregard of the constitutional rights clearly established and set forth in section 2(c) of the school board policy, and, consequently their actions cannot reasonably be characterized

as being in good faith. At best, the Defendants' actions, in interpreting this policy, demonstrate their "confusion" in how the suspension procedure ought to have been implemented. If confused, the Forest Hills School Board should take full responsibility for the language employed in the Suspension/Expulsion policy. Such confusion, however, is insufficient to allow an entitlement to qualified immunity to these Defendants. A compensatory award is, therefore, appropriate.

In *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), in separate incidents, two students were suspended from a public elementary school and a public secondary school without being given an adjudicatory hearing. The students filed suits against school officials under 42 U.S.C. § 1983, seeking declaratory and injunctive relief, together with actual and punitive damages. After granting the students preliminary injunctions, the two cases were combined for trial. The district court held that the students had been suspended without the procedural due process required by the Fourteenth Amendment and that they were thus entitled to declaratory relief, but that their claims for damages failed for complete lack of proof. On appeal, the Seventh Circuit reversed, holding that the students were entitled to recover substantial non-punitive damages even if the suspensions were justified, and even if they did not prove that any other actual injury was caused by the denial of procedural due process. On certiorari, the *Carey* court reversed and remanded, holding that in the absence of proof of actual injury, the students were entitled to receive only nominal damages, not to exceed $1, from the school officials. In doing so, the court also held:

> In this case, the Court of Appeals held that if petitioners can prove on remand that '[respondents] would have been suspended even if a proper hearing had been held,' [*Piphus v. Carey*] 545 F.2d [30] at 32 [ (7th Cir.) ], *then respondents will not be entitled to recover damages to compensate them for injuries caused by the suspensions.* The court thought that in such a case, the failure to accord proce-

dural due process could not properly be viewed as the cause of the suspensions. Ibid.; cf. *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 285–287, 97 S.Ct. 568, 50 L.Ed.2d 471 [575–76] (1977); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 270–271, n. 21, 97 S.Ct. 555, 565–66, n. 21, 50 L.Ed.2d 450 (1977). The court suggested that in such circumstances, an award of damages for injuries caused by the suspensions would constitute a windfall, rather than compensation, to respondents. 545 F.2d, at 32, citing *Hostrop v. Board of Junior College Dist. No. 515*, 523 F.2d [569] at 579 [ (7th Cir.) ]; cf. *Mt. Healthy City Board of Ed. v. Doyle, supra*, [429 U.S.] at 285–286, 97 S.Ct. 568 [at 575], 50 L.Ed.2d 471. *We do not understand the parties to disagree with this conclusion. Nor do we.* 435 U.S. at 260, 98 S.Ct. at 1050 (Emphasis supplied; footnote omitted).

\* \* \* \* \* \*

Moreover, where a deprivation is justified but procedures are deficient, *whatever distress a person feels may be attributable to the justified deprivation rather than to deficiencies in procedure.* But as the Court of Appeals held, the injury caused by a justified deprivation, including distress, is not properly compensable under § 1983. 435 U.S. at 263, 98 S.Ct. at 1052 (Emphasis supplied; footnote omitted).

Counsel for the Plaintiffs fails to recognize the dual nature of the *Carey* holding and the consequent distinction drawn by the Supreme Court as to when compensatory damages are available. *Carey* discusses two events, both of which involve the deprivation of procedural due process. First, the court held that disciplinary action, imposed in violation of due process guarantees, are not compensable if it is later determined that the discipline imposed was justified. This is precisely the situation at hand. In contrast, the Supreme Court held that, in the event of non-justified disciplinary action, imposed in disregard of procedural due process guarantees, the disciplined student

may collect actual compensatory, as opposed to presumptive, damages. This aspect of *Carey* is clearly not at issue in the present case.

Here, the school board, as previously mentioned, concurred for the most part in the recommendations of the defendants. This concurrence manifested itself in the expulsion of Darby and Falkenstern. Thus, when a hearing was conducted, the determination was made that the pupils' action warranted the extreme discipline of expulsion, thereby demonstrating that the students would have been expelled "even if a proper hearing had been held". Accordingly, pursuant to *Carey*, compensatory damages, above a nominal amount, are not justified in this case.

The Court finds that each Plaintiff is entitled to an award from these Defendants in the amount of $1.